[Cite as *State v. Thompson-Rivers*, 2025-Ohio-5067.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-65 |
| Appellee | : | |
| | : | Trial Court Case No. 22-CR-518(A) |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| TIERAICE A. THOMPSON-RIVERS | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 7, 2025, the judgment of the trial court is affirmed in part and reversed in part.

Costs to be paid as follows: 50% by the Appellant and 50% by the Appellee.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

RONALD C. LEWIS, JUDGE

EPLEY, P.J., and TUCKER, J., concur.

KATHLEEN EVANS, Attorney for Appellant
DANIEL P. DRISCOLL, Attorney for Appellee

LEWIS, J.

{¶ 1} Tieraice A. Thompson-Rivers appeals from his convictions in the Clark County Common Pleas Court of various felony offenses related to a shooting. For the following reasons, the judgment of the trial court is affirmed in part and reversed in part.

## I. Procedural History and Facts

{¶ 2} On June 22, 2022, a Clark County grand jury indicted Thompson-Rivers on two counts of improperly discharging a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1), second-degree felonies (Counts 1 and 2); one count of discharging a firearm on or near a prohibited premises (serious physical harm), in violation of R.C. 2923.162(A)(3), a first-degree felony (Count 3); two counts of felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), second-degree felonies (Counts 4 and 5); one count of having weapons while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), a third-degree felony (Count 6); and one count of having a weapon under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), a third-degree felony (Count 7). All counts included three-year firearm specifications, except for the two counts of having weapons while under disability.

{¶ 3} The case proceeded to a two-day jury trial beginning on September 10, 2024. The following is a summary of the testimony presented at trial.

{¶ 4} Daniel Faer lived at a residence on Tibbetts Avenue in Springfield, Ohio, on the corner of Tibbetts and Euclid Avenues. Faer had previously interacted with the people

living at 1002 and 1004 Tibbetts Avenue and believed they lived there on May 10, 2022. Faer's home had a security camera mounted outside of a bedroom window on the second floor that was activated by either motion or sound. Once activated, it would send a clip to an online cloud file that Faer could access. On the evening of May 10, 2022, Faer's surveillance video was working and captured a shooting on Euclid Avenue. A copy of Faer's surveillance video was submitted as State's Exhibit 1. Faer did not recognize any of the people depicted in the video.

{¶ 5} M.L. testified that on May 10, 2022, she was at her brother's house located on Tibbetts Avenue near the intersection of Euclid and Tibbetts Avenues. While hanging out with her brother, S.W., some women down the street on Euclid Avenue recognized M.L. from her job and called out for her to come over. The women were listening to music playing from a car speaker and wanted M.L. to bring a sound bar over to make the music louder. M.L. and S.W. walked over to the group of women. M.L. and the women hugged while S.W. stayed off to the side because he did not know any of the women. There was also a group of men present, but M.L. did not know who they were and could not identify any of them. While S.W. was standing around, one of the men approached him and began talking, but M.L. did not know what was said. M.L. could tell that the men outside appeared aggressive toward S.W., but she did not know why.

{¶ 6} M.L. next saw a green light on S.W.'s chest, which she identified as a light from a gun. M.L. stepped in between her brother and the other man and told S.W. they should leave. M.L. could not identify the men who approached her and her brother because they wore masks. S.W. had a gun in his waistband, but he did not take it out.

{¶ 7} M.L. and S.W. walked toward S.W.'s home, and they were shot from behind. M.L. was shot once through the ankle and fell to the ground. S.W. was struck multiple

3

times.   M.L. crawled toward her brother who was in front of her.   M.L. did not know who shot her, as she had her back turned when she was shot.   M.L. was taken to the hospital where she was in severe pain.

{¶ 8} S.W. testified that on May 10, 2022, he lived in a house on Tibbetts Avenue. His sister, M.L., had come over that day, and they spent the day together.   Later that night, there was a group of people outside, including some women dancing.   While S.W. and M.L. were on S.W.'s front porch drinking and listening to music, the women talked to M.L. about getting a sound bar.   M.L. went over to the group of women and danced with them while S.W. went with her and stood off to the side.

{¶ 9} S.W. got into an argument in the street with a man who had asked what he was doing in the area.   S.W. tried to explain that he was just there because of his sister.   S.W. had a gun in his waistband at the time, and the other man tried to reach for it but was unable to get it.   M.L. came over to S.W., and they started walking towards S.W.'s home when gunshots were fired.   S.W. never pointed his gun at anyone or threatened to shoot anyone. S.W. did not know any of the men outside that evening and did not recognize them.

{¶ 10} S.W. and M.L. were struck by the gunshots and fell to the ground on the corner of Euclid and Tibbetts Avenues where the police found them.   S.W. was shot 13 times.   He did not know who shot him.   S.W. did not know Thompson-Rivers and had never met him before.   He had no reason to know of any motivation Thompson-Rivers might have had to shoot him.

{¶ 11} Police found two shell casings on S.W.'s front porch.   S.W. explained that earlier in the day, he and M.L. had been messing around with his gun and shot it off in the air.   He denied shooting at anyone or threatening to shoot anyone.

4

{¶ 12} Springfield Police Officer Chris Kitchen testified he was working on May 10, 2022, when he received an emergency tone to respond to two individuals shot near Euclid and Tibbetts Avenues. When Kitchen arrived on scene a few minutes later, another officer was already tending to M.L. and S.W. who had suffered gunshot wounds. Kitchen took photographs, helped tape off the scene, and closed the roads. Kitchen spoke with people who were outside to see if anyone had seen what had happened or if anyone had surveillance cameras that captured the shooting. Kitchen then responded to the hospital where he photographed M.L. and S.W.'s injuries, collected property, and obtained additional information from the victims.

{¶ 13} Springfield Police Sergeant Doug Pergram was called to the scene of the shooting at 12:30 a.m. on May 11, 2022. Pergram responded to the intersection of Euclid and Tibbetts Avenues and was assigned to collect evidence. He and other officers took photographs of the scene, collected evidence, and used a drone to record an aerial view of the scene.

{¶ 14} Sergeant Pergram went to 1002 and 1004 Tibbetts Avenue, which was "a double," located on the corner of Tibbetts and Euclid Avenues. At 1002 Tibbetts Avenue, there were suspected bullet strikes in the upper corner of the front porch, the side, the second story, and the front of the residence. There were two suspected bullet strikes to the left of the front door of 1002 Tibbetts Avenue with a corresponding suspected bullet strike on the opposite side of the wall inside the front room of the home. There was also a suspected bullet strike on the exterior of the home to the right of the downspout. None of the bullets from the building were recovered primarily due to the age of the home and how it was constructed.

{¶ 15} Sergeant Pergram testified that a cartridge is the object that is placed into the firearm that expels the bullet. A cartridge consists of four components: case (or casing), primer, powder charge, and bullet. When a firearm is fired, the striker hits the primer, which causes an explosion that ignites the gunpowder and propels the bullet out through the gun barrel. The bullet is the projectile that causes the damage, whereas the casing is ejected from the gun and falls to the ground. The majority of the items collected from the scene consisted of fired cartridge casings. Pergram was unable to determine the caliber of any of the bullets recovered because he cannot perform that kind of analysis. Rather a firearms examiner would have been responsible for that examination. In total, 31 cartridge cases were collected, which included 9 mm, 5.7x28, and .40-caliber S&W casings, indicating that at least three different guns were fired, if not more.

{¶ 16} Sergeant Pergram returned to the scene in daylight to look for additional evidence. While there, he spoke to some of the residents whose houses were struck. They stated that they did not know what constituted old damage and what was new damage.

{¶ 17} Springfield Police Detective Kevin Miller testified that he was assigned to the crimes against persons division and was called out to the intersection of Tibbetts and Euclid Avenues on May 10, 2022. When Miller arrived, he spoke with the officer in charge of the scene to learn what evidence had been located and what witnesses had been identified, and then Miller formulated a plan to investigate. While on scene, Miller visited 1002 and 1004 Tibbetts Avenue. The residents were on their porches and spoke to the detective about their homes being struck. Other officers were already on scene processing that evidence, and the residents allowed Miller inside where he observed "fresh" bullet holes from the outside of the house into the house.

6

{¶ 18} Several homes in the area appeared to have surveillance video cameras on their exteriors. Detective Miller collected surveillance footage, State's Exhibit 1. He reviewed the footage and recognized Myron Colvin, with whom he was familiar from prior investigations, as one of the men pointing a gun at the victims. Miller was aware that Colvin was known to document his everyday life on social media and had a Snapchat account. Miller obtained a search warrant for Colvin's Snapchat account through which he recovered videos from the night of the shooting.

{¶ 19} Each of the Snapchat videos, submitted at trial as State's Exhibit 127, had titles based on the year, month, day, hour, minute, and second that the videos were taken. The timing of each video was listed in Universal Time ("UTC"). To obtain the Eastern Standard Time ("EST") corresponding with a given UTC time, four hours must be subtracted from the UTC time. Translated into EST, the first two videos were taken on May 10, 2022, at 11:50 p.m. and 11:52 p.m., respectively. The third video was taken on May 11, 2022, at 1:49 a.m., after the shooting occurred.

{¶ 20} Detective Miller stated that he recognized Thompson-Rivers in the first Snapchat video and identified Thompson-Rivers in the courtroom as the person in the video. Miller recognized the Snapchat video as having been taken in front of a home on Euclid Avenue near Tibbetts Avenue. He was familiar with the area and recognized it in the video. He also knew Colvin to frequent that area. The video showed the address of a home on Euclid Avenue, which corresponded with the area of the May 10, 2022 shooting. The second Snapchat video showed Colvin and another individual Miller recognized as Tylee Thompson in a car in front of the home on Euclid Avenue on the night of the shooting. Miller identified Thompson as Thompson-Rivers's cousin. The third Snapchat video showed a view from a vehicle driving by the scene of the shooting.

7

**{¶ 21}** Detective Miller explained that after seeing Thompson-Rivers in the Snapchat video, which was in color, he reviewed State's Exhibit 1, which was in black and white, to ascertain which figure in the video was Thompson-Rivers. Miller identified Thompson-Rivers based on his shorts and lanyard, as well as his hairstyle at that time. Miller then described the actions of the person in State's Exhibit 1 whom he identified as Thompson-Rivers. According to Miller, Thompson-Rivers was in between the group of women and men when the victims walked into view of the camera. Once the first person started shooting at the victims, Thompson-Rivers pulled a gun out from his waistband and shot multiple times toward the victims. When Thompson-Rivers stopped shooting, he got into the driver's seat of a vehicle and fled the scene.

**{¶ 22}** Thompson-Rivers was later apprehended and interviewed by Detectives Ron Jordan and Justin Massie. Detective Miller reviewed the investigator notes taken by Jordan and Massie, which included a statement by Thompson-Rivers admitting that he was present at the scene of the May 10, 2022 shooting and that he had a gun. According to the notes, Thompson-Rivers discussed who was present and why he was there. Although Thompson-Rivers admitted he had a gun, he denied that he had shot anyone or had shot into any house. Thompson-Rivers never turned in a firearm to compare to any of the ballistic evidence recovered from the scene.

**{¶ 23}** Detective Miller identified certified copies of an entry and dispositional entry from the Juvenile Section of the Clark County Domestic Relations Court. The entries reflected that "Tieraice Thompson Rivers" had been adjudicated delinquent for what would have been aggravated robbery, a first-degree felony offense of violence, and possession of drugs, a fifth-degree felony drug offense, had the offenses been committed by an adult.

The entries did not include the offender's date of birth, social security number, or any other identifying information.

{¶ 24} At the conclusion of trial, the jury found Thompson-Rivers guilty as charged in the indictment. At sentencing on September 20, 2024, the trial court imposed a stated prison term of 6 years on Count 1, a stated prison term of 6 years on Count 2, an indefinite minimum term of 10 years in prison and a maximum term of 15 years in prison on Count 3, a stated prison term of 8 years on Count 4, and a stated prison term of 6 years on Count 5. Count 6 was merged with Count 7 and the State elected to sentence Thompson-Rivers on Count 6. The court imposed a stated term of 36 months in prison on Count 6. All counts were ordered to be served consecutively. Additionally, the trial court imposed a mandatory 3-year prison term on each of the firearm specifications attached to Counts 1 through 5. The court ordered the specifications for Counts 1 and 3 to be served prior to and consecutive to the underlying offenses. The 3-year prison terms imposed on the specifications for Counts 2, 4, and 5 were ordered to run concurrently with the other firearm specifications.

{¶ 25} Thompson-Rivers timely appealed.

## II. Merger

{¶ 26} In his first assignment of error, Thompson-Rivers claims:

The trial court erred when it convicted and sentenced Mr. Thompson-Rivers to felonious assault and discharging a firearm on or near a prohibited premises when both offenses resulted in the same harm.

{¶ 27} Thompson-Rivers asserts that his convictions for felonious assault based on causing serious physical harm to S.W. and discharging a firearm on or near a prohibited premises should have merged at sentencing because the serious physical harm involved in

9

his felonious assault offense was the same serious physical harm that elevated to a first-degree felony his offense of discharge of a firearm on or near a prohibited premises.

{¶ 28} Section 10, Article I of the Ohio Constitution prohibits multiple punishments for the same offense. This prohibition is codified at R.C. 2941.25, which states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 29} "When a defendant's conduct supports multiple offenses, courts apply the allied offenses analysis set forth in R.C. 2941.25 to determine if the offenses merge or if the defendant may be convicted of separate offenses." *State v. Woodard*, 2022-Ohio-3081, ¶ 35 (2d Dist.). Multiple offenses do not merge if (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately, or (3) the offenses were committed with a separate animus. *State v. Ruff*, 2015-Ohio-995, paragraph three of the syllabus. Two or more offenses are dissimilar within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at paragraph two of the syllabus. A defendant bears the burden of establishing entitlement to merger, and we

10

review a trial court's ruling on the issue de novo. *State v. LeGrant*, 2014-Ohio-5803, ¶ 15 (2d Dist.).

{¶ 30} Thompson-Rivers was convicted of two counts of felonious assault under R.C. 2903.11(A)(2); one count each for S.W. and M.L. R.C. 2903.11(A)(2) provides, in relevant part, that "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon." Thompson-Rivers was also convicted of one count of improperly discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), which provides: "No person shall . . . [d]ischarge a firearm upon or over a public road or highway." The offense was elevated to first-degree felony because it caused serious physical harm to another person. R.C. 2923.162(C)(4). During sentencing, defense counsel asked the trial court to merge the count of discharge of a firearm on or near prohibited premises "into the felonious assaults," but the trial court declined.

{¶ 31} At the outset, we agree that Thompson-Rivers committed the offenses of felonious assault and discharging a firearm on or near prohibited premises with the same conduct and animus. The record reflects that Thompson-Rivers fired multiple shots in rapid succession over the roadway in the direction of S.W. and M.L. in a residential neighborhood. However, we cannot say that the trial court erred by refusing to merge the two offenses because they were not of similar import or significance.

{¶ 32} We have previously recognized the principle articulated by the Ohio Supreme Court that "merger is not required if offenses 'are not alike in their significance and their resulting harm.'" *State v. Williams*, 2018-Ohio-1647, ¶ 23 (2d Dist.), quoting *Ruff*, 2015-Ohio-995, at ¶ 21. We further explained in *Williams* that "'[t]he victim of the offense of discharging a firearm upon or over a public road or highway is the public. This is because

11

it is the act itself that is prohibited. The offense can be completed with no one remotely near the location where the firearm is discharged upon or over the public road or highway. R.C. 2923.162(A)(3) is a statute intended to benefit the public good[.]'" *Id.* at ¶ 24, quoting *State v. James*, 2015-Ohio-4987, ¶ 33 (8th Dist.). Additionally, we noted that "where a defendant's conduct places more than one person at risk, that conduct can support multiple convictions because the offenses are of dissimilar import." *Id*. at ¶ 23, citing *Ruff* at ¶ 23.

{¶ 33} Thompson-Rivers attempts to distinguish his case from *Williams* on three grounds. First, Williams did not raise the issue of allied offenses in the trial court resulting in a plain error review on appeal, whereas Thompson-Rivers raised it at sentencing. Second, in *Williams*, this court identified the possible harms of the offense of discharging a firearm on or near a prohibited premises as placing multiple people at risk and harming the public at large, but here, the offense required evidence of serious physical harm to elevate it to a first-degree felony and the victim of the offense was a specific person, not the public. Finally, *Williams* did not explicitly consider whether the first-degree felony form of the offense involves an additional harm besides the public, i.e., the person who suffered serious physical harm. Based on these differences, Thompson-Rivers contends that his convictions should have merged, and his sentences should be reversed. We do not agree.

{¶ 34} In *Williams*, the defendant fired shots across a roadway toward a store where numerous people were standing outside. *Williams* at ¶ 3. One of the shots struck and killed Terion Dixon. *Id*. Williams was convicted of murder (proximate result of felonious assault) and discharging a firearm on or near prohibited premises. The trial court did not merge the two offenses at sentencing. On appeal, we affirmed the trial court's decision regarding merger.

{¶ 35} While it is true that the procedural posture of Thompson-Rivers's case is different, insofar as Thompson-Rivers objected below and now challenges the trial court's decision to apply merger, we find the substantive analysis in *Williams* and subsequent cases equally applicable here. *State v. Davison*, 2021-Ohio-728, ¶ 33 (2d Dist.). Thompson-Rivers relies heavily on the premise that the serious physical harm caused to S.W. for felonious assault was the same serious physical harm used to elevate the offense of discharging a firearm on or near prohibited premises, which he contends requires merger. But Thompson-Rivers was convicted of felonious assault by a deadly weapon under R.C. 2903.11(A)(2), not felonious assault by serious physical harm under R.C. 2903.11(A)(1). The State was not required to show that Thompson-Rivers caused serious physical harm to S.W. to prove felonious assault. Knowingly firing a deadly weapon at S.W. with the intent to cause physical harm, whether S.W. was struck or not, was sufficient to commit the offense of felonious assault under R.C. 2903.11(A)(2).

{¶ 36} Further, we have previously considered, and rejected, the same argument made by Thompson-Rivers. In *Williams*, we explained in a footnote that

> Williams' act of shooting Dixon elevated the degree of the offense of
> discharging a firearm on or near prohibited premises to a first-degree felony.
> *See* R.C. 2923.162(C)(4). The fact remains, however, that the act of
> discharging a firearm over a public road or highway itself constituted a violation
> of the statute. *See* R.C. 2923.162(A)(3).

*Williams*, 2018-Ohio-1647, at ¶ 24, fn. 4 (2d Dist.).

{¶ 37} This court has consistently applied the reasoning in *Williams* to conclude that felonious assault and discharging a firearm on or near prohibited premises are dissimilar in import and significance because the nature of the harm addressed by each offense is

13

different. *See State v. Davis*, 2025-Ohio-1676, ¶ 37-38 (2d Dist.) (where defendant fired multiple gunshots at victim over a roadway and also struck a home, felonious assault and discharging a firearm over a public road or highway did not merge); *State v. Coleman,* 2021-Ohio-968, ¶ 23-29 (2d Dist.) (concluding the trial court erred in merging murder and discharging a firearm over a public road or highway where the defendant fired one shot over the roadway at close range that killed the victim). Thompson-Rivers's act of firing multiple gunshots at two individuals across a roadway in a residential neighborhood placed multiple people at risk of harm. The fact that serious physical harm resulted from the shooting elevated the offense to a first-degree felony, but the victims remained the public and the individual who suffered serious physical harm. The offense does not require that Thompson-Rivers intended to harm a particular person, only that by committing the offense he caused serious physical harm to someone. Notably, Thompson-Rivers caused serious physical harm to two people by shooting over the roadway. Felonious assault, on the other hand, demands a higher degree of culpability of the defendant by requiring proof that the defendant "knowingly" caused or attempted to cause physical harm to another person. As we have similarly held, the merger analysis does not change even where the physical harm to the victim of a defendant's felonious assault by a deadly weapon offense also elevates the degree of the defendant's conviction for discharging a firearm on or near prohibited premises. *State v. Johnson*, 2022-Ohio-4629, ¶ 28 (2d Dist.).

**{¶ 38}** The first assignment of error is overruled.

### III. Ineffective Assistance of Counsel

**{¶ 39}** In his second assignment of error, Thompson-Rivers raises the following claim:

14

Trial counsel was ineffective for failing to move to dismiss the weapons under disability charges pursuant to *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), where the alleged disability is predicated on juvenile adjudications.

**{¶ 40}** Thompson-Rivers asserts that he received ineffective assistance of counsel because his trial counsel failed to file a motion to dismiss Counts 6 and 7 of the indictment based on *Bruen*. The basic premise of Thompson-Rivers's argument is that his convictions on Counts 6 and 7 are unconstitutional as applied to him, and therefore, he was prejudiced by counsel's failure to file the motion to dismiss. Thompson-Rivers was not convicted of Count 7 as that offense merged into his conviction on Count 6. Accordingly, we summarily reject his argument as it relates to Count 7 because there is no reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different for that count. We also reject Thompson-Rivers's argument regarding Count 6, but for other reasons.

**{¶ 41}** "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To be considered deficient performance, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687. To be deemed prejudicial, the appellant must show that counsel's errors were so serious as to deprive the appellant of a fair trial. *Id*. "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that,

15

but for counsel's error, the result of the proceeding would have been different." *Davis* at ¶ 10. The failure to demonstrate either prong is fatal to an ineffective assistance of counsel claim. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶ 42} Thompson-Rivers was convicted of having weapons while under disability in violation of R.C. 2923.13(A)(2) as charged in Count 6 of the indictment. R.C. 2923.13(A)(2) provides, in relevant part, that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance if . . . [t]he person . . . has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." Thompson-Rivers's prior adjudication forming the basis of the charge occurred in August 2018 when he was 15 years old. He was ordered to serve a three-year sentence in the Department of Youth Services for his adjudication as a delinquent child for having committed an offense that would have been aggravated robbery, a first-degree felony had it been committed by an adult. Aggravated robbery is a felony offense of violence. R.C. 2901.01(A)(9)(a). Notably, the prior adjudication reflects that as part of a plea agreement, the State dismissed a count of attempted murder as well as a firearm specification. When Thompson-Rivers committed the offenses at issue in this appeal, he was 18 years old.

{¶ 43} When considering allegations of ineffective assistance of counsel, claims under *Strickland's* performance prong are evaluated in light of the available authority at the time of counsel's allegedly deficient performance. "A reviewing court must strongly presume that 'counsel's conduct falls within the wide range of reasonable professional assistance,' and must 'eliminate the distorting effects of hindsight, * * * and * * * evaluate [counsel's] conduct from counsel's perspective at the time.'" (Bracketed text in original.)

*State v. Sanders*, 92 Ohio St.3d 245, 273 (2001), quoting *Strickland* at 689. Thompson-Rivers relies heavily on the First District Court of Appeals' decision in *State v. Thacker*, 2024-Ohio-5835 (1st Dist.), *appeal accepted*, 2025-Ohio-705, to support his position that counsel was ineffective for failing to file a motion to dismiss. Yet *Thacker* was decided on December 13, 2024, approximately three months *after* Thompson-Rivers's trial. Furthermore, *Thacker* is distinguishable in that it addressed the constitutionality of R.C. 2923.13(A)(3) as applied to Thacker, who was charged with having a weapon while under disability for having a prior juvenile adjudication of a non-violent felony offense. *Thacker* at ¶ 2. Notably, the First District explained that "[b]ecause Thacker's challenge is limited, so, too, is the reach of our holding," and a ruling in his favor "will only prevent the challenged statute's 'future application in a similar context,' but will not 'render it utterly inoperative.'" *Id*. at ¶ 8, quoting *Wymsylo v. Bartec, Inc*., 2012-Ohio-2187, ¶ 22. At the time of this writing, the only appellate court in Ohio that has addressed the constitutionality of R.C. 2923.13(A)(2) involving a juvenile adjudication for an offense that would have been a felony offense of violence had it been committed by an adult found the statute constitutional. *State v. King*, 2024-Ohio-4585 (8th Dist.), *appeal accepted*, 2025-Ohio-598. *King* was decided on September 19, 2024, which was also after Thompson-Rivers's trial.

{¶ 44} In *State v. Carnes*, 2018-Ohio-3256, the Ohio Supreme Court held that the use of a prior juvenile adjudication of delinquency for the commission of an offense that would have been a felony offense of violence had it been committed by an adult was not unconstitutional. *Id*. at ¶ 1. Nearly four years after *Carnes* was decided, the United States Supreme Court decided *Bruen*, which did not involve a juvenile adjudication. *Bruen* reiterated that the Second Amendment protects the right of an ordinary law-abiding citizen to carry a firearm for self-defense. *Bruen*, 597 U.S. at 9. Nevertheless, the Court indicated

17

that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Thus, while the government may impose some regulations on firearms, there are limitations. To determine whether a government regulation on firearms is permitted under the Second Amendment, the Court set forth the following two-part test to apply: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 24.

{¶ 45} Following *Bruen*, the United Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024), clarifying that in the second step of the test announced in *Bruen*, the State need only to show the challenged regulation has a well-established and representative historical analogue, not a "historical twin." *Id.* at 692. In determining whether the government could regulate a person's possession of a firearm, the Court concluded that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. at 702. Notably, the *Rahimi* Court stated that it has recognized that prohibitions on guns, "like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Rahimi* at 699, quoting *Heller* at 626, 627, fn. 26.

{¶ 46} Neither *Bruen* nor *Rahimi* directly addressed the specific issue of whether a person who was adjudicated delinquent for an offense that would have been a felony offense of violence had it been committed by an adult can be lawfully prohibited from possessing a firearm. And at the time Thompson-Rivers went to trial, no Ohio appellate district, including this one, had addressed whether the decisions in *Bruen* or *Rahimi* precluded the State from prohibiting the possession of a firearm by a person who had been adjudicated delinquent for

18

an offense that would have been a felony offense of violence had it been committed by an adult. However, in 2018, the Ohio Supreme Court explicitly held that R.C. 2921.13(A)(2), the same statute upon which Thompson-Rivers was convicted, was constitutional. *Carnes*, 2018-Ohio-3256, at ¶ 21. Moreover, the day before Thompson-Rivers was sentenced, the Eighth District held that R.C. 2923.13(A)(2) does not violate the protections guaranteed by the Second Amendment. *King*, 2024-Ohio-4585, at ¶ 33 (8th Dist.).

{¶ 47} A lawyer does not perform deficiently by failing to raise novel arguments regarding the constitutionality of a statute that are unsupported by any binding legal authority. *State v. Payne*, 2024-Ohio-4698, ¶ 82 (10th Dist.). Nor does counsel fall below *Strickland's* standard of reasonableness by failing to predict changes in the law, or to argue for an extension of precedent. *State v. Driffin*, 2022-Ohio-804, ¶ 9 (8th Dist.).

{¶ 48} Thompson-Rivers's argument focuses solely on the prejudice prong of *Strickland* and presumes that counsel's performance fell below an objective standard of reasonableness. But Thompson-Rivers must establish both prongs of *Strickland* for this court to grant a reversal based on ineffective assistance of counsel. At the time Thompson-Rivers went to trial, existing Ohio Supreme Court precedent found the statute in question constitutional. While Thompson-Rivers's case was pending sentencing, an Ohio appellate court found the statute constitutional even when applying *Bruen*.

{¶ 49} We conclude that counsel's failure to file a motion to dismiss on grounds that the charge against him for having a weapon while under disability was unconstitutional did not fall below the professional norms of reasonableness. Thompson-Rivers has therefore not established that his counsel was ineffective under *Strickland*, and his second assignment of error is overruled.

19

## IV.    Sufficiency of the Evidence

{¶ 50} In his third assignment of error, Thompson-Rivers alleges the following claim: There was insufficient evidence to support either conviction for improperly discharging a firearm at or into a habitation.

{¶ 51} Thompson-Rivers maintains that the State presented insufficient evidence that Thompson-Rivers did not have the privilege to fire his gun into the residences at 1002 and 1004 Tibbetts Avenue and, further, that there was insufficient evidence that he shot at or into the residence at 1004 Tibbetts Avenue.   "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law."   *State v. Hatten*, 2010-Ohio-499, ¶ 18 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).   A sufficiency determination is in essence a test of adequacy: whether the evidence is legally sufficient to sustain a verdict, which is a question of law.   *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955).   "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt."   *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.   A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact."   *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997), citing *Jenks* at 273.

{¶ 52} Thompson-Rivers was convicted of two counts of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1).   That statute provides, "[n]o person, without privilege to do so, shall knowingly . . . [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual . . . ."

20

An "occupied structure" is defined, in part, as any house, building, or other structure, or any portion thereof, which at the time is "occupied as the permanent or temporary habitation of any person, whether or not any person is actually present." R.C. 2909.01(C)(2). The term privilege is defined in R.C. 2901.01(A)(12) as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity."

{¶ 53} The burden is on the State to establish all material elements of a crime by proof beyond a reasonable doubt. *State v. Adams*, 62 Ohio St.2d 151, 153 (1980), citing *Mullaney v. Wilbur*, 421 U.S. 684 (1975). Circumstantial evidence and direct evidence possess the same probative value. *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991), citing *Jenks* at paragraph one of the syllabus. Therefore, "[a] conviction can be sustained based on circumstantial evidence alone." *Id.*, citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155 (1988).

{¶ 54} According to Thompson-Rivers, there was no testimony from any of the owners or residents of 1002 or 1004 Tibbetts Avenue that Thompson-Rivers did not have the privilege to shoot at or into their residences. Furthermore, there was insufficient evidence that bullets struck 1004 Tibbetts Avenue as a result of the gunfire on May 10, 2022. The State responds that although neither the owners nor residents of either residence testified at trial, there was sufficient evidence demonstrating that Thompson-Rivers did not have a privilege to shoot at or into the residences. The State cites to the testimony of Sergeant Pergram that he took photographs of "1002 and 1004 Tibbetts that showed fresh bullet strikes in the homes." Appellee's Br., p. 14. The State further relies on Detective Miller's testimony about speaking to the residents after the shooting who allowed him to enter their residences where he verified there were fresh bullet holes from outside the house

21

into the house. Finally, the State relies on the "natural inference" that a homeowner would not have cooperated with police had they given Thompson-Rivers the privilege to shoot at their homes. *Id.* at 15.

{¶ 55} Thompson-Rivers relies on *State v. Bradley*, 2024-Ohio-5225 (7th Dist.), *appeal accepted on other grounds*, 2025-Ohio-1090, to support his argument that the State failed to prove lack of privilege as an element of the offense. In *Bradley*, the defendant, Bradley, was charged with one count of felonious assault and two counts of discharging a firearm into a habitation. *Id.* at ¶ 5. The charges were based on an argument Bradley and a contractor, in which the contractor, who had just been dismissed that day, entered Bradley's home to collect his supplies and Bradley fired six shots at the contractor, allegedly in self-defense. In addition to shooting the contractor, Bradley's bullets also struck two homes across the street. The jury found Bradley not guilty of felonious assault but guilty of two counts of discharging a firearm into a habitation. *Id.* at ¶ 51. Relevant here, Bradley alleged on appeal that there was insufficient evidence presented at trial to support the guilty verdicts where the essential element of "without privilege to do so" was not proven beyond a reasonable doubt. *Id.* at ¶ 62.

{¶ 56} The Seventh District Court of Appeals concluded that a defendant's lack of privilege is an essential element of the offense, which must be proven by the State beyond a reasonable doubt. *Id.* at ¶ 77. The Seventh District explained:

> The phrase "without privilege to do so" is included in the text of the statute as an element of the offense. Contrary to the state's argument, we conclude the legislature's decision to include the words "without the privilege to do so" makes this an element of the offense with the burden on the state. Therefore,

the state had the burden to prove Appellant lacked privilege to shoot at or into the neighbors' dwellings.

*Id.* The court acknowledged that the State could have proven this element by circumstantial evidence. *Id.* at ¶ 78.

{¶ 57} Upon review, we do not find the Seventh District's reasoning persuasive regarding the burden of proof and respectfully decline to follow it. The offense for which Thompson-Rivers was charged provides that "[n]o person, without privilege to do so, shall knowingly . . . [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2923.161(A)(1). As noted above, the Seventh District's decision to place the burden on the State to prove that the defendant is without privilege is based solely on the fact the words "without the privilege to do so" are included in the statute. *Bradley* at ¶ 77. But just because certain words are included within the text of the statute does not mandate that the language qualifies as a material element of the offense, which the State is required to prove beyond a reasonable doubt. Rather, a more nuanced analysis of the statute is required.

{¶ 58} For example, in the statute imposing criminal liability for having weapons while under disability, the statute provides that, "*[u]nless relieved from disability under operation of law or legal process*, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance," if certain conditions are met. (Emphasis added.) R.C. 2923.13. This court has held that it is not part of the State's burden to prove at trial that a defendant has not been relieved from disability despite the fact that the language is included in the statute. *State v. Lanier*, 2008-Ohio-4018, ¶ 33-38 (2d Dist.). In *Lanier*, we relied on *State v. Jenkins*, 1980 WL 354652 (8th Dist. Apr. 24, 1980), which explained that whether the accused had obtained relief from disability constituted "'an excuse or justification peculiar[ly]

23

within the knowledge of the accused,'" which acted as an affirmative defense. *Lanier* at ¶ 37, quoting *Jenkins*. An affirmative defense is a defense that is expressly designated as affirmative or is "[a] defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." R.C. 2901.05(D)(1)(a)-(b).

{¶ 59} Another example is the statute imposing criminal liability for obstructing official business. Obstructing official business is defined as "[n]o person, *without privilege to do so* and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's capacity, shall do any act that hampers or impedes a public official in the performance of the official's lawful duties." (Emphasis added.) R.C. 2921.31(A). We have acknowledged the conclusion of other appellate districts that the absence of privilege is not an essential element of obstructing official business that the State must prove beyond a reasonable doubt. *State v. Fader*, 2018-Ohio-4139, ¶ 15 (2d Dist.). The First District Court of Appeals held in *State v. Gordon*, 9 Ohio App.3d 184 (1st Dist. 1983), that "the absence of privilege is not an essential element of obstructing official business that the state must prove beyond a reasonable doubt." *Id*. at 187. *Accord State v. Elkins*, 2018-Ohio-1267, ¶ 20 (5th Dist.) ("the absence of privilege is not an essential element of obstructing official business which the State must prove beyond a reasonable doubt."); *State v. Novak*, 2017-Ohio-455, ¶ 18 (4th Dist.); *State v. Whiting*, 2019-Ohio-56, ¶ 53 (6th Dist.); *State v. Williams*, 2004-Ohio-4476, ¶ 38 (8th Dist.). The First District explained that "privilege" is a broad range with a tremendous number of possible privileges, and the existence, nature, and scope of a privilege is dependent on the circumstances surrounding the defendant, which would be matters primarily within the grasp of the defendant. *Gordon* at 186.

{¶ 60} The overt conduct that is prohibited in R.C. 2923.161(A)(1) is knowingly discharging a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual. The commission of this offense constitutes a felony offense of violence. R.C. 2901.01(A)(9)(a). Discharging a firearm at an occupied structure inherently presents a serious risk of potential injury to others. And the interest of a private person in the inviolability of their home is significant. *State v. Steffen*, 31 Ohio St.3d 111, 115 (1987). Common sense dictates that a person normally does not have a privilege to discharge a firearm at or into an occupied structure. As the First District noted in *Gordon*, a privilege includes a broad range of potential circumstances. Requiring the State to prove that a defendant under any circumstance did not have a privilege to discharge a firearm at or into a habitation is an onerous burden which could not have been intended by the legislature. Accordingly, the privilege in this context is "an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." R.C. 2901.05(D)(1)(b). We therefore conclude that whether an individual has a privilege to avoid criminal liability under R.C. 2923.161(A)(1) for shooting into an occupied structure is an affirmative defense for which the defendant bears the burden of producing such evidence.

{¶ 61} In considering the totality of the evidence in this case in the light most favorable to the State, we conclude there was sufficient evidence to show that Thompson-Rivers did not have a privilege to shoot a firearm at or into any habitation. Detective Miller testified that he spoke with the residents of 1002 and 1004 Tibbetts Avenue who cooperated and permitted him to enter their residences. Photographic evidence from Sergeant Pergram reflected that several "suspected bullets" entered the home just inside the front door of 1002 Tibbetts Avenue and struck the walls in the front room. The testimony of the victims

and the surveillance video reflected that the shooting, which occurred around midnight, was a spontaneous event. Immediately after the shooting, in which approximately 30 shots were fired, Thompson-Rivers and the other shooters fled the scene. It is clear from the evidence that the intended target was S.W., who was shot 13 times, and anything else that may have been struck was incidental. There was no evidence put forth that Thompson-Rivers was acting in self-defense, which may potentially have granted him a privilege, or was in any other position to have been granted a privilege by law. Accordingly, Thompson-Rivers acted without privilege in discharging his firearm at or into an occupied structure.

{¶ 62} Thompson-Rivers also argues that there was insufficient evidence that bullets struck 1004 Tibbetts Avenue as a result of the gunfire on May 10, 2022, and therefore his conviction related to that address should be reversed. We agree.

{¶ 63} As noted above, none of the owners or occupants of 1002 or 1004 Tibbetts Avenue testified at trial. No testimony was adduced identifying how the structure was separated into 1002 versus 1004 Tibbetts Avenue to know whether any of the suspected bullet strikes to the exterior of the building affected 1004 Tibbetts Avenue. At best, the damage identified in State's Exhibits 114 and 115 might be attributed to 1004 Tibbetts Avenue. Nevertheless, no ballistics evidence was recovered from 1004 Tibbetts Avenue that tied any suspected damage from the residence to the shooting that occurred on May 10, 2022. Sergeant Pergram testified he took photographs of several holes that were "suspected bullet strikes." However, Pergram's testimony did not make clear that any of the suspect bullet strikes were in fact caused by bullets, that the damage was specifically connected to 1004 Tibbetts Avenue, or that it was a result of the May 10, 2022 shooting. Contrary to the State's contention, Pergram never testified that any of the "suspected bullet strikes" were "fresh." Instead, according to Pergram, the residents were uncertain of what

26

damage was new or old, indicating that some of the defects to the structure were not from the May 10, 2022 incident. One of the spent shell casings recovered from Euclid Avenue, an FC 9 mm luger, was admitted at trial as State's Exhibit 134. The description of State's Exhibit 134 was that it "appears old," indicating it was not connected to the May 10, 2022 shooting.

{¶ 64} Detective Miller testified that the residents at 1002 and 1004 Tibbetts Avenue allowed him to go inside their residences where he verified there were "fresh bullet holes" from the outside of the house into the house. Trial Tr. 214. Miller did not specify where any interior damage was found or clarify whether it was inside 1002 or 1004 Tibbetts Avenue. Of the photographic evidence that was collected, State's Exhibits 117-121 were identified by Sergeant Pergram as showing that suspected bullets came into the house just inside the front door of 1002 Tibbetts Avenue and struck the walls in the front room. There was no evidence presented that any bullets entered the residence at 1004 Tibbetts Avenue or that there was any interior damage to 1004 Tibbetts Avenue. Thus, Miller's testimony involving "fresh bullet holes" can reasonably be inferred as related to 1002 Tibbetts Avenue, but not 1004 Tibbetts Avenue.

{¶ 65} After viewing the evidence in a light most favorable to the State, we cannot conclude that any rational trier of fact could have found the essential elements of improperly discharging a firearm at or into a habitation with regard to 1004 Tibbetts Avenue proven beyond a reasonable doubt. Even accepting as true that the suspected bullet strikes were caused by bullets, there was insufficient evidence tying any damage to 1004 Tibbetts Avenue and the May 10, 2022 shooting.

{¶ 66} In reviewing the indictment, the bill of particulars, the State's opening and closing arguments at trial, the jury instructions, and the verdict forms, the State did not

identify which count applied to which residence. However, when discussing the charges, the State repeatedly referenced the residence at 1002 Tibbetts Avenue before 1004 Tibbetts Avenue, which implied that Count One concerned 1002 Tibbetts Avenue and Count Two concerned 1004 Tibbetts Avenue. We remind the State that in the future, when there are two identical charges, each count should be clearly designated based on which facts apply to which count. Under these circumstances, we conclude that Count One applied to 1002 Tibbetts Avenue and Count Two applied to 1004 Tibbetts Avenue.

{¶ 67} Accordingly, we sustain Thompson-Rivers's third assignment of error, in part, and vacate his conviction of Count Two.

## V. Manifest Weight of the Evidence

{¶ 68} In his fourth assignment of error, Thompson-Rivers alleges the following claim:

Mr. Thompson-Rivers's convictions are against the manifest weight of the evidence.

{¶ 69} Thompson-Rivers alleges that the identification of him as one of the shooters was against the manifest weight of the evidence, which requires the reversal of all his convictions. Apart from this general contention, Thompson-Rivers argues that the weight of the evidence does not support a finding that there were "fresh" bullet holes in either 1002 or 1004 Tibbetts Avenue connected to the May 10, 2022 shooting to support his two convictions for improper discharge of a firearm into a habitation.

{¶ 70} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should be reversed as against the manifest weight of the evidence only "'in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id*., quoting *Martin* at 175.

{¶ 71} Neither of the victims was able to identify any of the shooters, and no eyewitnesses testified that Thompson-Rivers was involved in the shooting. Nor was there any forensic evidence that tied Thompson-Rivers to the shooting. The identification of Thompson-Rivers as one of the shooters was based solely on Detective Miller's testimony.

{¶ 72} Miller testified he viewed the surveillance video that captured the shooting on the night of May 10, 2022, and immediately recognized Myron Colvin based on prior investigations. After obtaining Colvin's Snapchat records, Miller located three videos taken around the time of the shooting. Two of the Snapchat videos were taken just prior to the shooting and showed the people, cars, and location where the shooting took place. Miller identified Thompson-Rivers in one of the Snapchat videos. He then re-watched the surveillance video and identified which figure was Thompson-Rivers based on Thompson-Rivers's clothing description and hairstyle at that point in time. Although the surveillance video was in black and white, the Snapchat videos were in color. Miller testified that when Thompson-Rivers was interviewed, he admitted to being present at the time of the shooting and having a firearm.

{¶ 73} Thompson-Rivers argues that Detective Miller's identification was not credible because Miller did not testify how he was familiar with Thompson-Rivers in order to recognize him. While it is true that Miller never laid a foundation concerning his knowledge of Thompson-Rivers's identity, Thompson-Rivers did not object at trial or question Miller's familiarity of him or lack thereof. Nor was any evidence introduced that contradicted Miller's

29

testimony with regard to his identification of Thompson-Rivers. It is equally irregular that Miller testified regarding Thompson-Rivers's damaging admissions even though he was not present for the interview conducted by other detectives. But, again, there were no objections to Miller's testimony, and the jury was informed that Miller based his knowledge on the report of other detectives. Accordingly, the jury was left to determine whether Miller credibly identified Thompson-Rivers based on his testimony. The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). Here, the jury credited Miller's testimony and found that Thompson-Rivers was one of the shooters involved in the May 10, 2022 shooting. We cannot conclude the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thus, Thompson-Rivers's convictions are not against the manifest weight of the evidence due to lack of identification.

{¶ 74} Thompson-Rivers also argues that his convictions for improperly shooting into a habitation are against the manifest weight of the evidence. Because we previously concluded that Thompson-Rivers's conviction for improperly shooting into a habitation as to 1004 Tibbetts Avenue was not supported by sufficient evidence, it is necessarily against the manifest weight of the evidence. *State v. Short*, 2017-Ohio-7200, ¶ 22 (2d Dist.). As to 1002 Tibbetts Avenue, we conclude that the jury did not lose its way in finding him guilty of improperly shooting at or into a habitation.

{¶ 75} Sergeant Pergram testified he took photographs of several holes that were "suspected bullet strikes" to 1002 Tibbetts Avenue. No bullets were recovered from 1002 Tibbetts Avenue. However, State's Exhibits 117-121 were identified by Pergram as showing two suspected bullets that had entered 1002 Tibbetts Avenue just inside the front

30

door and struck the walls in the front room. Although Detective Miller did not clarify which residence he had entered, he testified that he had observed "fresh" bullet holes inside the home, which the jury could reasonably infer was Miller's identification of the same interior damage that Pergram identified in State's Exhibits 117-121. Had there been fresh bullet holes inside 1004 Tibbetts Avenue, one would have expected photographs of that damage, which there was not. Despite the lack of explanation of how Miller knew the damage was caused by "fresh" bullet holes, he testified that there were fresh bullet holes, reasonably implying that they were caused by the May 10, 2022 shooting. It was within the province of the jury to believe or disbelieve the witness's testimony. "In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented." *State v. Greenlee*, 2020-Ohio-4764, ¶ 21 (2d Dist.), citing *State v. Hunt*, 2019-Ohio-2352, ¶ 24 (2d Dist.).

{¶ 76} In reviewing the record as a whole, we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice has occurred regarding the conviction related to the residence at 1002 Tibbetts Avenue. Thompson-Rivers's fourth assignment of error is sustained in part and overruled in part.

## VI. Prosecutor's Misconduct

{¶ 77} In his fifth assignment of error, Thompson-Rivers alleges the following claim:

Mr. Thompson-Rivers was deprived of his right to due process and a fair trial when prosecutors failed to correct false and misleading testimony from investigating officers, plainly violating *Napue v. Illinois*, 360 U.S. 264 (1959).

{¶ 78} Thompson-Rivers argues that Sergeant Pergram's testimony regarding whether 1002 and 1004 Tibbetts Avenue was a single structure, or two separate structures was misleading, and the State's failure to correct the testimony affected the outcome of the

31

trial. The misleading testimony presumably caused the jurors to believe that the two residences were separate structures when in fact it was only a single structure, resulting in two separate convictions. In support of his argument, Thompson-Rivers relies on *Napue v. Illinois*, 360 U.S. 264 (1959), and *State v. Staten*, 14 Ohio App.3d 78 (2d Dist. 1984).

{¶ 79} Under *Napue*, the prosecution has a responsibility and duty to correct false testimony. *Glossip v. Oklahoma*, 604 U.S. 226, 252 (2025), citing *Napue* at 269-270. "To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Id*. at 246, quoting *Napue* at 269. Once that showing has been made, a new trial is warranted only "if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio v. United States*, 405 U.S. 150, 154 (1972), quoting *Napue* at 271. "The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989), citing *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987).

{¶ 80} In *Staten*, this court found that the defendant in a robbery case was entitled to a new trial based upon prosecutorial misconduct. *Staten* at 81-83. There the prosecutor knowingly permitted the inaccurate inference to persist that a State's witness had been given certain funds from the defendant and that these funds were direct proceeds of a robbery. We concluded that the prosecutor had a duty to clear up the misunderstanding as the prosecutor "was privy to knowledge that the testimony [of the witness] was both incorrect and misleading." *Id*. at 82. The prosecutor "compounded" the error by referring to the inaccuracy during opening and closing arguments. *Id*. at 84-85. As the prosecutor's

misconduct was so egregious that it affected the defendant's fundamental right to a fair trial, we concluded that a new trial was warranted. *Id*. at 84-85.

{¶ 81} Thompson-Rivers's reliance on *Staten* is misplaced. Although there was a perceived inconsistency in Sergeant Pergram's testimony, it did not rise to the level of prosecutorial misconduct. When Pergram was initially asked if he went to any residences to gather additional evidence, he testified he went to "1002 and 1004 Tibbetts Avenue, which is a double on the southeast corner." Trial Tr. 175-176. When reviewing photographs taken on May 11, 2022, the following testimony was adduced:

[Pergram]: [State's exhibit] 98, this photograph in my hand is the same photograph that you're looking at on here; and I want to make a correction. I earlier said it was a double house. They're two separate residences. 1002 Tibbetts Avenue, this would be the house on the left. The house on the right with the porch light on would be 1004.

[Prosecutor]: The two separate residences, where two people could live in?

[Pergram]: Yeah, they're two separate houses.

Trial Tr. 176-177. Based on the testimony and evidence presented throughout trial, the house "on the right with the porch light on" was S.W.'s home, not 1004 Tibbetts Avenue.

{¶ 82} Later in Sergeant Pergram's testimony, he identified State's Exhibit 102 as a photograph showing the front porch of 1002 Tibbetts Avenue. When questioned, Pergram stated that 1004 Tibbetts Avenue could also be seen in the photograph. The photograph clearly depicted that 1002 and 1004 Tibbetts Avenue were part of the same structure.

{¶ 83} It is true that Sergeant Pergram's testimony regarding whether 1002 and 1004 Tibbetts Avenue were part of a single structure (a double unit) or were two separate structures was not clear during the above-cited portion of his testimony. However, the

evidence presented during the remainder of trial clarified that although 1002 and 1004 Tibbetts Avenue were part of a single structure, the addresses were two separate residences within that structure. The State argued at trial that because both 1002 and 1004 Tibbetts Avenue had damage from the shooting and because they were separately occupied portions of an occupied structure, Thompson-Rivers was responsible for shooting into two habitations. The State did not imply that the residences were two independent structures. Unlike in *Staten*, the prosecutor here did not use Pergram's misstated testimony to support Thompson-Rivers's convictions. Under these circumstances, there is no reasonable likelihood that the misstatement by Pergram would have affected the jury's verdict. Moreover, because we vacated Thompson-Rivers's conviction as it relates to 1004 Tibbetts Avenue, any potential prejudice in being convicted of two offenses rather than one has been remedied.

**{¶ 84}** Thompson-Rivers's fifth assignment of error is overruled.

**VII. Conclusion**

**{¶ 85}** Having sustained Thompson-Rivers's third assignment of error in part, we vacate Thompson-Rivers's conviction of Count 2 of improperly discharging a firearm at or into a habitation as it relates to 1004 Tibbetts Avenue. The judgment of the trial court is affirmed in all other respects.

. . . . . . . . . . . . .

EPLEY, P.J., and TUCKER, J., concur.

34